Hon. SAMUEL AMES,
Hon. GEORGE A. BRAYTON,
Hon. ALFRED BOSWORTH.

---

WILLIAM G. HAMMOND & others *v.* NATHAN STANTON & others.

A bill in equity by the creditors of an insolvent debtor calling upon his assignees under a voluntary assignment made by him for their benefit, for an account, sale and distribution of the assigned property, is not met, nor is the delay, if unreasonable, excused by the fact that the deed of assignment in express terms vests in the assignees a discretion as to the time and manner of the sale, nor by the fact that the delay was, under the circumstances of the case, advised by counsel; such discretion and advice being necessarily subject to the control and revision of the court.

Where one of two assignees, under a voluntary assignment for the benefit of creditors, by a secret arrangement with his co-assignee, purchases at private sale for a nominal price, in the names of third persons who subsequently convey to him, portions of the real estate assigned incumbered with mortgages, alleging as the motive of his purchase, " that the land was cheap," such purchase is voidable in a court of equity on the ground of *fraud;* and the conveyances carrying it out will be set aside on a bill by the creditors impeaching them *as fraudulent,* notwithstanding it is probable that at public sale the property would not have brought more than was paid therefor by the assignee.

6 *

Under such circumstances, the delay of the creditors for two years after the recording of the conveyances, to file their bill to set them aside, will not disentitle them to relief on the ground of fraud.

BILL IN EQUITY, filed on the 19th day of October, 1853, by William G. Hammond and others, judgment creditors, and creditors by promissory note and book account of Nathan Stanton, in their own behalf and in behalf of the other creditors of Nathan Stanton, against the said Nathan Stanton, Gilbert Stanton, Job F. Stanton, and John F. Tennant. The bill, in substance, alleged that on the 21st day of December, 1848, Nathan Stanton made a voluntary assignment of all his estate, real and personal, to the other defendants, in trust for the payment of his debts without preference, in the execution of which they joined, covenanting to execute the trusts thereof, and under which they possessed themselves of a large amount of real and personal estate belonging to said Nathan ; that the trustees were obliged by the deed of trust, to convert the trust property into money as soon as practicable, and to distribute the same without preference amongst the plaintiffs and others, creditors of the said Nathan, but that they had not so done ; " but contriving to injure your orators, have wrongfully and fraudulently converted the same to their own use and their own benefit and have deprived your orators of all use and benefit thereof ; " that the trustees, " fraudulently contriving to injure your orators in the premises," on the 26th day of September, 1851, without consideration, conveyed about eight acres of land situated on the road leading from Newport to Bristol Ferry, and being part of the assigned estate, said land being under mortgage, to one Jonathan James, father of the holder of the second mortgage on the land, under an intimation from Gilbert Stanton to said James, that by taking from the assignees a quitclaim of the equity of redemption, said James and himself could pay off the first mortgage and hold the land together ; and that upon this intimation, James took the deed from the assignees without consideration, and without consideration subsequently quitclaimed the same to Gilbert, one of the assignees, who, under that deed, now holds the same, claiming it as his own property and for his own use and benefit, and thereby " fraudulently and

unlawfully seeks to wrong and defraud your orators in the premises;" that on the 26th day of September, 1851, "the said Gilbert Stanton and Job F. Stanton further contriving to defraud and injure your orators in the premises, conveyed to one William Turner all the right, title, and interest which the said Nathan Stanton assigned to them in another parcel of land," containing about five acres, and situated on the main road in Newport, and that three days after, on the 29th day of September, 1851, Turner reconveyed the same to Gilbert Stanton, who now claims to hold said land as his own property discharged from the trusts of the assignment.

The bill further alleged that one John F. Tennant was, at the date of the assignment, the mortgagee of another parcel of the assigned estate, situated in Newport, containing about four acres, and that Gilbert and Job F. Stanton, "fraudulently designing to defraud and injure your orators, and to prevent them from redeeming said parcel of land," and "fraudulently and confederating with said Tennant for the purpose of injuring your orators in the premises, did, on the 11th day of October, 1851, without consideration in fact, as your orators aver, though under pretence of a nominal consideration of one dollar, convey to said Tennant" the interest of said Nathan in said parcel of land, to them assigned, and they claimed the right of redeeming said parcel of land from said Tennant, upon payment to him of the sums due to him upon his mortgage and for his improvements, and prayed that the parcel of land be sold, and the proceeds of sale be applied to that purpose, and the balance to the payment of the creditors of said Nathan.

The bill further alleged that Gilbert and Job F. Stanton, by virtue of said assignment from Nathan, possessed themselves of a large amount of personal property of the value of ten thousand dollars and upwards, which they and their confederates have concealed and withheld from the creditors of Nathan Stanton, and have either wasted or converted to their own use, and for which they pray an account; and stated that divers other parcels of real estate and bank stocks came to the hands and possession of the said Gilbert and Job F. Stanton, as assignees, which they had fraudulently concealed from the creditors of

Nathan, with the intent to deprive them of all benefit therefrom, and prayed that they may be compelled to renunciate, and to disclose to whom they had conveyed them, and upon what consideration, and particularly whether they had conveyed any real estate assigned to them to one Daniel Congdon, and whether they had conveyed any to Francis B. Peckham, and if any, upon what consideration they had conveyed it.

The bill charged that the assignees, Gilbert and Job F. Stanton, wholly refused to execute the above trust by applying the above property to the purposes of the same, or to render any account thereof, and that Tennant, claiming under his quitclaim from the assignees, refused to permit the creditors to redeem, and prayed for a discovery, many special interrogatories being filed, and for an account of the trust funds in the hands of the assignees, Gilbert and Job F. Stanton; and that the amount for which they were found accountable, might be brought into the registry of the court for distribution amongst the creditors of Nathan Stanton entitled thereto; and that Gilbert Stanton might be decreed to convey to such master as the court might appoint, the parcels of land quitclaimed to him by Jonathan James and William Turner, to be sold under the direction of the court for the benefit of the complainants; that John F. Tennant might be decreed to render a full and true account of the amount of his mortgage upon the lot conveyed to him by Gilbert and Job F. Stanton, and of the rents and profits thereof, and that the complainants might be permitted to redeem the same upon payment of such sum as might be found justly due to said Tennant; and for further relief.

The assignment appended to and made a part of the bill, was by indenture, and was executed by Nathan Stanton, the assignor, and Gilbert and Job F. Stanton, the assignees. It bore date the 21st day of December, 1848, and conveyed to the assignees in fee, all the estate, real and personal, of the assignor, in trust to convert the same into money, "within such convenient time as shall meet the best interests of all concerned, and either by public or private sale, and for the best prices that can be obtained for the same;" and directed that after deducting therefrom the costs and charges of the trust, the assignees

should distribute the proceeds of sales and collections in equal proportions to and among all the creditors of the assignor, without preference, and pay over the surplus, if any, to the assignor; and the assignees expressly covenanted that they would faithfully execute their trust, would render a just account of all moneys of the trust by them received, and would pay over and distribute the same as directed by the assignment, to the best of their skill and ability.

On the same day that the bill was filed, the subpœna was served upon the defendants, two of the Stantons and Tennant, and on the 7th of December following, upon Job F. Stanton, at that time a resident in North Providence.

On the 27th of February, 1854, the defendants filed their several answers to the bill. The answer of Nathan Stanton, the assignor, after setting forth his embarrassments, and that to relieve them he was obliged to raise money by mortgage on his real estate, and to pledge his bank stock for an amount equal to its value to the banks in which he held it, admits, that he did, on the 21st December, 1848, execute to his co-defendants, Gilbert Stanton and Job F. Stanton, the assignment in trust for the benefit of his creditors, without preference to any, a copy of which was appended to and made part of the bill; that he delivered to his assignees his books of account, bills, notes, and all his evidences of indebtment, and that the schedules annexed to his assignment contained a list of all his property except of his book accounts for money owing to him and of the promissory notes due to him, and that he did not deliver to his assignees any other property; that the assignment was made in good faith for the benefit of all his creditors, and that he has in no way received any benefit from it since the assignment.

The joint and several answers of Gilbert and Job F. Stanton, the assignees, admitted the assignment mentioned in the bill, and that they possessed themselves of all the property mentioned in it, and of the books of account, notes, and other business papers of the assignor; but averred, that upon taking an account of the value of the same, they found that all his real estate was mortgaged to a great amount. The answer then set forth the various mortgages on different parcels of the real estate, to one

Simon Newton for $1,010; to Gilbert Stanton, one of the assignees, for $850; to Joseph T. Perry, for $1,500; to Gilbert Stanton, and one James B. James, for $1,200; to John F. Tennant, the respondent, for $1,000; to George I. Bailey, for $1,400; to one Stephen F. Stanton and one Peter B. Underwood, $500; the principal sum, besides interest, of all the mortgages, amounting to $7,450; that upon taking an account of the value of the bank stock assigned, and on inquiry at the banks, they ascertained that all said bank stock was pledged at the banks, for money loaned to the assignor previous to the assignment, and no part of it ever became assets in their hands; that the personal property assigned, deducting expenses of sale, the same having been sold by them at public auction, realized the sum of $1,108.$\frac{92}{100}$; that the real estate assigned was mortgaged to its full value, if not to more, taking into consideration the right of dower of the wife of the assignor; that they advertised the right of the assignor in it to be sold at public or private sale, besides applying to different persons to purchase the same; and were diligent in their endeavors to find purchasers, but the estates being so heavily mortgaged, could find none but the mortgagees; that afterwards, in consequence of the said Simon Newton's attaching in another state certain produce belonging to the assignor, his mortgage was thereby in part discharged, and that the interest of Nathan Stanton, in the land so mortgaged, was by them sold to Francis B. Peckham for the sum of $205.$\frac{21}{100}$; that the right of the assignor in the premises mortgaged to John F. Tennant was sold to him at public auction for the sum of one dollar; that the right of the assignor in the premises mortgaged to Gilbert Stanton (one of the assignees) was sold at private sale to one William Turner for the sum of one dollar; that the right of the assignor in the premises mortgaged to Joseph T. Perry, was sold to one Jonathan James for one dollar; that the right of the assignor in the premises mortgaged to George I. Bailey, Stephen F. Stanton, and Peter B. Underwood, was sold for five dollars; and that the whole amount realized from the sale of the real estate assigned was $213.$\frac{21}{100}$, which was fully equal in value to the interest of Nathan Stanton, the assignor, therein.

The answer further alleged, that under the discretion given to

them by the assignment as to the mode of sale, they sold the property assigned in both modes, and to the best advantage; that they advertised the real estate for sale at public auction, and at the time of sale, there being a numerous company of persons present, amongst whom were real estate brokers and land agents, they offered for sale the premises mortgaged to John F. Tennant, and that the only bidder for said premises was said Tennant himself, to the amount of one dollar, which bid said Tennant made by the advice of a person attending the sale for the purpose of perfecting his title ; that in further discharge of their duty, and to sell all the estate of Nathan Stanton, and after giving full and public notice of their intention, they sold at private sale all the right of the assignor in and to all his real estate, for the best price that could be got for the same, and credited the estate with the amounts received by them therefor ; that they sold the fee in one part to one William Turner for one dollar; the fee in another part, to one Jonathan James, for one dollar; and the fee in another part, to one Daniel Congdon, for five dollars ; and that in all these transactions they acted in good faith, and for the best interests of the creditors of the assignor ; that in regard to the sale made to Francis B. Peckham, Stanton, the assignor, purchased the premises for $1,010, and at the time of purchase mortgaged the same to Simon Newton for the same amount, with interest at six per cent.; but that Newton, not trusting to the mortgaged premises for the payment of said sum, attached the personal estate of Nathan Stanton in another state, for the purpose of securing his debt, and after recovering judgment obtained a large amount out of the attachment, which was credited on his mortgage.

The answer alleged that the respondents have been at all times desirous to distribute the proceeds of the assigned estate in their hands amongst the creditors of the assignor; but that the creditors delayed to bring in their claims, and have not as yet all brought them in; that they have now moneys in their hands collected from the debts and sales, of which they annex a true account to their answer ; but have not distributed the same, because all the creditors have not presented their claims, and they have been threatened with suits at law and equity,

and they wished to satisfy all the creditors that they had acted in good faith; that they consulted counsel eminent in the law, in all their actions and doings, and have followed their advice; and especially consulted them in relation to investing the moneys received by them, and were told that it was not safe for them so to do.

By the account appended to the answers of the assignees, it appeared that they had received in cash . . $1,689.80

| | | |
|---|---|---|
| That they had paid out . . . $240.79 | | |
| That they charged for services . . 400.00 | | 640.79 |

Leaving the balance on hand . . . . $1,049.11

From this account it also appeared that the sales of the personal property and collections of debts, from which all but $213.$\frac{21}{100}$ was received by the assignees, were made in the latter part of 1848, and early part of 1849, and the deeds of the real estate executed by them bore date in September, 1851.

The answer of John F. Tennant alleged that for a long time previous to the assignment made by Nathan Stanton, he frequently applied to him for loans of money, and that the respondent did loan him money, taking his promissory notes therefor, upon which the interest, as it fell due, was paid; and that he held said notes against said Stanton on the 16th day of December, 1848; that a short time previous to that day, said Stanton applied to him for the loan of more money, and offered to secure him by mortgage for the whole if he would make it up to $1,000; that Stanton and himself accounted together; that he advanced him the additional sum, and took his note and mortgage for $1,000, being the money so lent; that after the assignment by Stanton, nothing was paid on said mortgage, and becoming anxious about his money, he took measures to obtain possession of the mortgaged premises, and after some delay, gave notice to the assignees that unless the interest and taxes were paid he should be under the necessity of suing for the same; and that in consequence of his said demand, the assignees gave him quiet and peaceable possession of the premises mortgaged to him on the 9th day of February, 1850; that after he was thus put in possession he offered the lease of the

same at auction for one year; and as no more than forty dollars was bid for the same, he improved the premises himself; that afterwards, and on or about the 11th day of October, the premises were advertised by the assignees of Nathan Stanton for sale at public auction, and were sold to him, as the highest bidder therefor, for the sum of one dollar, and he received from the assignees, on the same day, a deed of the same; that the premises were at that time subject to the dower of the wife of Nathan Stanton, who for a valuable consideration released her right to the respondent; that taking into view this incumbrance, the premises were mortgaged for more than their then value, and that he was a loser by the transaction; that at the time of the sale, the principal and interest due on the mortgage, and the taxes, amounted to $1,070; that the rents and profits were about forty dollars a year, and less than that, including repairs of fences; and that he paid $100 for the release of dower aforesaid, and that he deems the title to said parcel of land absolute in him.

A general replication was filed, and the cause put to proof. Several depositions were taken, principally on the part of the complainants; but as the evidence which bears upon the case is commented on in the opinion of the court, the recital of it here becomes unnecessary.

*Sheffield*, for the complainants, contended that upon the admissions of the answers of the principal defendants it was a clear case for an account, and must go to a master for that purpose. He further contended that the land of the assigned estate bought by Gilbert Stanton, one of the assignees, must, upon the common principle, be ordered to be resold. The purchase was at least a constructive fraud; and the proof went much further. It was evident that Gilbert Stanton, the assignee and brother of Nathan, contrived conveyances to himself, through the instrumentality of Jonathan James and William Turner, of two of the lots of land assigned to him and his nephew, Job F. Stanton, for the benefit of the creditors of Nathan, without offering them at public sale, and for the avowed purpose of making a good thing of it. He also adverted to the removal of

goods from the store of Nathan to that of Stephen Stanton, just previous to the assignment of the former, to the gross delay in distributing the amount realized from sales of assigned personal estate amongst the creditors, and to the difference between the amount of sales now rendered, and that which according to the testimony was admitted by one of the assignees at or about the time of sale, as pointing in the same direction. He cited *Prevost* v. *Gratz*, 6 Wheat. 481 ; 1 Story, Eq. Jurisp. § 322.

*Gilpin & Wm. H. Potter* took the ground that the testimony showed that the real estate was mortgaged to upwards its full value, taking into consideration the incumbrance of the dower of the assignor's wife ; and that the assignees, having vainly endeavored to sell at auction the lot mortgaged to John F. Tennant for more than the amount of the mortgages thereon, were justified in the transaction charged as fraudulent, as the best mode of closing up the assignment for the benefit of all concerned. The bill charged actual fraud upon the assignees ; and if the proof of this failed, as they contended that it did, the bill must fail altogether. They cited to this point, *Mount Vernon Bank* v. *Stone*, 2 R. I. Rep. 129; *Masterson* v. *Finnegan*, Ibid. 316.

They also took the ground, that, as the creditors had delayed filing their bill until Oct. 19, 1853, two years after the alleged fraud in the sales of the land, they had acquiesced in that transaction, and could not now impeach it.

AMES, C. J. This bill is filed by the complainants, as creditors of Nathan Stanton, in their own behalf and in behalf of his other creditors, against him and his assignees under a voluntary assignment, and against a mortgagee of said Nathan who has got in the equity of redemption by purchase from the assignees, for the double purpose, of obtaining from the assignees an account of the trust estate, and of setting aside certain conveyances of four parcels of the real estate assigned, made by the assignees, as alleged, in fraud of the rights of the creditors of said Nathan Stanton, entitled under the assignment.

So far as John F. Tennant, the mortgagee, is concerned, the bill totally fails.   He appears, from the evidence, to have been a fair mortgagee of one of the parcels of land assigned, who, upon the exposure of the equity of the mortgagor therein to public sale by the assignees, bought it in, as the highest bidder, to complete his title; and the bill accordingly must, as to him, be dismissed with costs.

The contest in the case, has really been between the creditors and the assignees; and certainly, in its general aspects, bears hardly against the latter.

In the latter part of December, 1848, Nathan Stanton, a small trader in country produce in Newport, professedly assigns all his property, real and personal, to his son, Job F. Stanton, and his brother, Gilbert Stanton, for the benefit of his creditors, without preference.   The assignees appear to have been quite diligent in making sale of the personalty assigned to them; for, as is shown by the account exhibited by them as a part of their answer, on the 3d day of January, 1849, they sold at auction, for cash, all his stock in trade, and on the 10th of January, 1849, all his farming stock and utensils; and within three weeks of the assignment, thus realized as the net amount of those sales, the sum of $1,108.32.   There were also assigned to them, debts by note and account due to the assignor, amounting, according to the schedule exhibited by them, to about $2,000; and a part of which, at least, must have been collected by them; but how much, or when, nowhere appears.   They admit, however, that out of all the assets, real and personal, they have received $1,689.80, from which they claim to deduct, as the amount by them paid out and retained for their services, $640.79; leaving a net balance on hand for distribution of $1,049.01.   Nothing further appears to have been done by them until the fall of 1851, when a portion of the real estate assigned was sold at public sale to Tennant, the mortgagee, for a nominal consideration, subject to his mortgage; another portion to Francis B. Peckham, subject to Simon Newton's mortgage, for the sum of $245.$\frac{21}{100}$; and the three remaining parcels were conveyed, for a nominal consideration, by the assignees to Gilbert Stanton, under an arrangement to which we shall in a moment direct

attention, who now claims, by virtue of the same, to hold the lands discharged from the trust. It is said by the assignees that this real estate was mortgaged for an amount exceeding its value at the time of the assignment. If this be so, what more simple than to sell it all at auction subject to its mortgages, and at least stop the accumulation of interest, and promptly close up the assigned estate. The answer discloses no reason for this delay, except that by the terms of the assignment they had the power to order the *time* and *manner* of sale ; as if a discretion of this kind in a trustee were not always subject to the revision of a court of equity when called upon, as in this case, to scan his proceedings by parties interested in the trust. Two years more elapse after the whole assigned estate, according to the admission of the assignees, has been converted into money, and yet no attempt to distribute the proceeds of it amongst the creditors according to the direction of the deed of assignment which they had covenanted to obey—making nearly five years from the date of the assignment; when, in October, 1853, this bill is filed against them for an account of the funds so long kept back from its proper destination. The only excuses given for such gross delay by the answers is, generally, that the creditors threatened suit and did not bring in their claims. The time when these threats were made is not even alleged, and neither the fact of threats, nor the time when made, proved. If made, as is probable, shortly before the suit, so far from being an ex-cuse for not distributing the proceeds of the assigned property, they were justly caused by the gross neglect to distribute them, which justified the worst suspicions of the creditors against the honesty of the assignees. The other excuse, that the creditors had not all brought in their claims, is still less countenanced by proof or probability, or even by any special averment in the answer. It nowhere appears that they even advertised for the creditors to bring in their claims, and still less stated in the advertisement that the creditors were called upon to do so, for the purpose of enabling the assignees to strike a dividend in their favor. It is, besides, wholly incredible that the son and brother of a small trader could not, with reasonable diligence, in such a community as Newport, having the assistance, too, of

the debtor, have easily found out all his creditors and the amount of their respective debts, in one tenth of the time of this long delay. Indeed, a very minute and long list of the creditors of the assignor is now presented by the assignees, which gives additional reason to suppose that this excuse is wholly groundless. Equally unavailing is the plea urged in the answer, though not supported by proof, that they acted in this matter under the advice of counsel learned in the law. The advice of counsel is given upon facts stated; and we have listened in vain to counsel, equally learned probably with the advisers, upon the facts proved and admitted to exist, for a tolerable reason for this gross delay to settle a small estate assigned for the benefit of creditors, the affairs of which seem to have been involved in no complexity whatsoever. Whilst claiming, however, that all this time was needed by the assignees to settle the estate, it is said that the creditors have, by their delay to prosecute, lost their right to look into the doings of the assignees, and have even acquiesced in the purchases made by one of them out of the assigned estate. *Both* these positions certainly cannot be well founded; and we think that neither of them is. The fraudulent neglect of assignees under an express trust for the benefit of a numerous body of small creditors, can hardly be met in a court of equity, by their forbearance to commence a suit for an account of their own property, or be construed into a relinquishment by acquiescence of the consequences of a gross breach of trust. The creditors are clearly entitled to an account from the assignees, and the case must go to a master for the purpose of taking it, the question of compensation and costs being reserved until the coming in of the master's report.

The only other question left in the case is concerning the conveyances of portions of the assigned lands made by the assignees to William Turner and Jonathan James, and by them to Gilbert Stanton, one of the assignees. The bill avers, in substance, that these were fraudulently made by the assignees under an arrangement with the ostensible purchasers to reconvey the same in whole or part to one of the assignees, and for the purpose of wronging and defrauding the creditors of

7 *

the value of the assignor's interest in those parcels of land. The answers of the assignees do not in terms deny that those conveyances were made under the arrangement charged; and in fact the arrangement is amply proved by the testimony of the ostensible purchasers, Turner and James, and by the deeds executed by the assignees to them, and by them to Gilbert Stanton, who seems to have been the active man in the business of the assignment. The answers simply set up in reply the formal conveyance of these parcels of land, for a nominal sum, to the purchasers, and state that in these, and in all their transactions and doings, they acted in good faith and for the best interests of the creditors of the assignor; not denying the *fact* charged, but relying upon the purity of the motive with which they acted in the matter. In short, the answers in this particular amount to this: the lands were so incumbered that the value assigned to us amounted to nothing, and so one of us took them for nothing, through a secret arrangement made by us with an ostensible purchaser at a nominal price. The three lots of land in question were not offered at public sale, and the value was not in that way ascertained. The only lot thus offered was that mortgaged to Tennant, who had pressed the assignees for his money, and under threat of suit had obtained possession of the premises mortgaged to him, and became the purchaser of them substantially for the amount of his mortgage. The sale seems to have stopped with that offer; and the only direct evidence given to us of the value of the lots in question, is that of Mr. Thomas R. Hazard, who admits that he was no judge of their value, and says that in his own refusal to purchase them at $300 per acre he was guided by his judgment that $300 per acre was all that they were worth for *farming purposes*. There is nothing either in his testimony, or in the other testimony in the cause, to indicate to us that such a standard of value is the true standard of value to be applied to land so near Newport; and it will hardly do in such a matter to rely upon the declarations to the value of the land made by the respondents in their answers.

The reason given by Gilbert Stanton to Jonathan James for the desire of the former to become, through a formal convey-

ance to the latter, the real purchaser of two of the lots of land at a nominal sum over the mortgages, was, that at that price the land was cheap, and would pay both mortgages on it, and something over. It is hardly necessary to cite numerous authorities to show that such a taking by a trustee of the trust property to his own use, and for such a motive, is a fraudulent abuse of his trust, and of the power which it gave him over the trust estate. Considering the position of the real purchaser, the motive was a corrupt one; and considering the manner of the sale and purchase,—the seller and purchaser being in effect the same person,—the transaction must be regarded rather as a contrivance than a contract.

In *Ferraby* v. *Hobson*, 2 Phillips; 22 Eng. Ch. R. 255, 257, 258, in which the charge in the bill was, that the trustee leased a portion of the trust estates to his sister, nominally at a low rent, but really for the benefit of himself, Lord Cottenham considered it as charging " personal corruption, and with appropriating to himself the property of others," a case, which he, in another part of his opinion, remarks, " if made out, would be very disgraceful to him (the trustee), as it would have shown an endeavor on his part to enrich himself at the expense of the estate of which he was trustee." In *Lewis* v. *Willman*, 18 Eng. L. & Eq. R. 45, decided by the house of lords in 1852, Lord St. Leonards, lord chancellor, strongly expresses the rule which seems to us precisely applicable to the present case. " I have been surprised, I confess," says he, " at this matter being pursued, when the rules of equity are so clear. No man in a court of equity is allowed himself to buy and sell the same property. He cannot sell to himself. Even in the case of a fair trustee, he cannot sell to himself. If he has the power or the trust to sell, he must have some one to deal with. Courts of equity do not allow a man to assume the double character of seller and purchaser; and it is necessary, in order to preserve the interests of persons entitled beneficially to property, to maintain that rule. *But here is a case which goes infinitely beyond that.* I should lay it down as a rule, my lords, that ought never to be departed from, that *if an attorney or agent can show that he is entitled to purchase, yet, if instead of openly purchasing, he pur-*

*chases in the name of a trustee or agent, without disclosing the fact, no such purchase as that can stand for a single moment.* Such a transaction, to stand, must be open and fair, and free from all objection; and if a man purchases, as these appellants purchased, by putting forward a clerk of their own, not as a clerk, not as an agent, but as an actual *bonâ fide* purchaser upon an absolute and independent contract, he does that which, the moment it is stated, renders the deed powerless for which it was framed and executed; and the court will hold the parties responsible for every thing that results from it."

Now precisely what Lord St. Leonards thus characterizes as infinitely beyond an open purchase of the trust property by a fair trustee, is what this bill charges, and the testimony proves, upon Gilbert Stanton in respect to the three parcels of land in question. The agents whom he secretly employed to effect his purpose are witnesses to the fact, and one of them to the motive of profit, which he admitted to have swayed him. The assignees, uncle and nephew, convey one of the lots, as appears from the records, to William Turner, on the 26th day of September, by deed received for record on the 29th September, 1851; and on the 29th September, 1851, William Turner conveys the same lot to Gilbert Stanton, by virtue of his agreement to that effect made when apparently purchasing for himself, his deed having been received for record on the 4th of October following. On the same 26th day of September, the assignees convey two other parcels of the trust estate to Jonathan James, under a like agreement, by a deed received for record on the 4th day of October following; and on the 26th day of January, 1853, James reconveys the lots to Gilbert Stanton by deed of that date received for record on the 29th day of January of the same year. The answers, as we have said, contain no reply to the special charges of fraudulent dealing with regard to these lots, contained in the bill; but simply speak of the sales to Turner and James, as if made to them as actual purchasers, and the nominal sums received from them as the consideration-money of the sales actually received from them. In other words, the assignees, after having by a secret arrangement conveyed the assigned property to one of their own number for a

nominal sum, now set up the conveyances thus made by them, as actual conveyances for value; and one of them claims the property in the character of purchaser from his own and co-assignee's grantees. Such conduct with regard to trust property, considering the duties of a trustee, is a gross fraud upon the trust, and upon those interested in it. It may have been caused by ignorance or bad advice, but that cannot alter the character stamped upon it by the commonest principles of justice. It is, and ought to be charged in the bill as a fraud, and the evidence fully proves that it has been committed. Indeed, the assignees seem to have treated this whole assignment as a species of family arrangement of the property of Nathan Stanton made between him and his brother Gilbert and son Job, in which every one's interest was to be more regarded than the interest of the creditors, for whose benefit the assignment was profess-edly made. The keeping back the proceeds of the property sold and admitted to be on hand from the creditors, for five years, without justifiable cause, is in the same direction with the ap-propriation of a portion of it, in the manner proved by one of them, with the expectation of profit.

There is some evidence of concealment of property from the creditors, a day or two before the execution of the assignment, by removing it at night from the store of Nathan Stanton, the assignor, to that of Stephen, another brother, since dead; but there is no evidence in the case connecting the assignees with the concealment, nor any charge in the bill fitted to relief on that ground, if any were desired, against the assignor, or any one else. Although a considerable portion of the argument was directed to this matter, we have placed no weight upon it in the conclusion to which we have come.

This cause must be referred to a master to take the account prayed in the bill; the question of compensation to the assignees, and of costs being reserved until the coming in of the master's report. The decree will declare the conveyances made by Job F. Stanton and Gilbert Stanton, as assignees of Nathan Stan-ton, to William Turner and to Jonathan James, and by the two latter persons to Gilbert Stanton, to be null and void, and will order the master to sell, under the direction of the court, all the

right, title, and interest, which Nathan Stanton had in the lands therein described at the date of the assignment, at public auction, to the highest bidder therefor, at some favorable time to be ascertained and reported by the master, for the benefit of the creditors of Nathan Stanton, the net proceeds of sale to be brought by the master into the registry of the court, for distribution amongst the complainants and such of the other creditors of Nathan Stanton as may intervene and become parties to this proceeding, by appearing and proving their claims before the master, and submitting to bear their proportion of the expenses of this suit.